IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CASE NO: 3:05-CR-287-F |
| | ) | |
| CORNELIUS DONAL TURNER | ) | |

### MOTION TO SUPPRESS

**COMES NOW** the defendant, **CORNELIUS DONAL TURNER**, by undersigned counsel and pursuant to Rule 12 of the Federal Rules of Criminal Procedure, and respectfully moves this Court to suppress all items seized and all statements obtained as a result of a police stop and search of the car that Mr. Turner drove on June 23, 2005, in Lee County, Alabama, in the Middle District of Alabama.

As grounds for this motion, Mr. Turner would show that such search and seizure violated his right to be free from unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution, and that any such statements obtained violated his right not to incriminate himself, under the Fifth Amendment to the U.S. Constitution.

### ISSUES PRESENTED

1.   Whether Mr. Turners was unlawfully detained and questioned when Sheriff's Deputy Jimmy Sanders initiated a traffic stop on June 23, 2005?

2.   If Mr. Turners was unlawfully detained and questioned, whether all evidence obtained as a result of that unlawful detention and questioning should be suppressed?

**PROPOSED FINDINGS OF FACT**

3.   Shortly after midnight on June 23, 2005, Deputy Sanders initiated a traffic stop of the car that Mr. Turner was driving.

4.   When Deputy Sanders approached Mr. Turner's car, Mr. Turner asked Deputy Sanders why Deputy Sanders stopped him.  Deputy Sanders didn't respond to Mr. Turner's question, but instead asked Mr. Turner for his driver's license.  Mr. Turner told Deputy Sanders that he didn't have his license with him.  Deputy Sanders then asked Mr. Turner for his name, date of birth and social security number.  Mr. Turner gave Deputy Sanders his brother's name (Chris Phillips) and his brother's date of birth and social security number.  Deputy Sanders then returned to his patrol car.

5.   While Deputy Sanders was in his patrol car, several other officers, in plain clothes and unmarked vehicles, arrived on the scene.

6.   Deputy Sanders then returned to Mr. Turner's car.

7.   Deputy Sanders instructed Mr. Turner to step out of his car.  Mr. Turner complied with this request, and Deputy Sanders patted down Mr. Turner, searching for weapons.  Deputy Sanders next asked Mr. Turner if he had any weapons in the car.  At this point Deputy Sanders still had not advised Mr. Turner of why he had been stopped nor had Deputy Sanders advised Mr. Turner of his rights.

8.   Mr. Turner told Deputy Sanders that there was a pistol under the driver's seat.  Deputy Sanders then entered Mr. Turner's car and retrieved the pistol from under the driver's

seat. At that time Deputy Sanders also searched the car and discovered a bag of crack cocaine stuffed down in the console between the driver's seat and the passenger's seat.

9. Deputy Sanders then placed Mr. Turner under arrest for possession of a controlled substance. He searched Mr. Turner and seized $945 in paper currency from Mr. Turner's pocket.

10. Deputy Sanders then drove Mr. Turner to the Lee County Jail. While Deputy Sanders transported Mr. Turner to the Jail, Mr. Turner repeatedly asked Deputy Sanders why he had stopped Mr. Turner. Deputy Sanders finally told Mr. Turner that the reason for the traffic stop was that Mr. Turner had failed to dim his headlights.

11. After arriving at the Jail, Investigator Eric McCain interrogated Mr. Turner. Investigator McCain advised Mr. Turner of his rights, but he did not tell Mr. Turner that any statements that Mr. Turner made before he was advised of his rights could not be used against him, nor did Investigator McCain tell Mr. Turner that any evidence seized as a result of his earlier unwarned statements could not be used against him.

## LAW

12. The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. Amend IV. Before police officers may stop a car, the officers must have a reasonable suspicion that a traffic violation has occurred or that criminal activity is in progress. See, *Whren v. United States*, 517 U.S. 806, 809 (1996); *Terry v.*

*Ohio*, 392 U.S. 1 (1967). While not all police-citizen encounters trigger Fourth Amendment scrutiny, a traffic stop is a limited seizure within the meaning of the Fourth Amendment, and it is analogous to an investigative detention. *United States v. Perkins*, 348 F. 3d 965, 969 (11th Cir. 2003).

13. "Under *Terry* an officer's actions during a traffic stop must be reasonably related in *scope* to the circumstances which justified the interference in the first place. Furthermore, the *duration* of the stop must be limited to the time necessary to effectuate the purpose of the stop. The traffic stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted; emphasis original).

14. Generally, upon issuing the citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay or additional questioning. *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999). A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998). "If, however, the officer continues to question the driver in the absence of either of these two circumstances, then 'any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms.'" *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (quoting *United States v.*

*Sandoval*, 29F.3d 537, 540 (10th Cir. 1994)).

15. The law of arrest is also relevant to determining whether a continued detention is unreasonable. An arrest occurs when a law enforcement officer takes some action, by physical force or show of authority, resulting in the type of seizure which would induce a reasonable person to believe that he is not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). An arrest is constitutionally valid, if "at the moment an arrest was made, the officers had probable cause to make it." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

16. However, detention based on an "unparticularized" or "unsupported" hunch violates the Fourth Amendment. *U.S. v. Perkins*, 348 F.3d 965, 972 (11th Cir. 2003); *U.S. v. Pruitt*, 174 F.3d 1215, 1221 (11th Cir. 1999).

17. The exclusionary rule principally serves "to deter future unlawful police conduct." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). "[T]he rule is a judicially created remedy designed to safeguard Fourth Amendment rights through its deterrent effect . . ." Id. at 348, 94 S.Ct. at 620. Thus, the rule must be applied in light of its deterrent purpose. "Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 1081 (1961). This prohibition applies as well to the fruits of the illegally seized evidence. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974).

## ANALYSIS

18.     When Deputy Sanders stopped Mr. Turner's car he knew only that Mr. Turner had failed to dim his headlights; he had no objectively reasonable and articulable suspicion that any other illegal activity had occurred, nor is there any evidence to suggest that the initial detention at any time changed to a consensual encounter.  When Deputy Sanders stopped Mr. Turner he didn't inform Mr. Turner of why he stopped him, even after Mr. Turner asked him why, but instead asked to see Mr. Turner's driver's license.  After Mr. Turner informed Deputy Sanders that he didn't have his license with him, Mr. Turner admittedly gave Deputy Sanders false identification information.  Deputy Sanders, however, had no way of knowing at that time that this information was false.

19.     Deputy Sanders returned to his patrol car, and after some time passed he again approached Mr. Turner's car.  Deputy Sanders then asked Mr. Turner to step out of his car and Deputy Sanders searched Mr. Turner for weapons; Mr. Turner was clearly not free to go on his way.  At that point, due to both the duration of the stop and Deputy Sanders' actions in requiring Mr. Turner to get out of his car and submit to a pat down search, Mr. Turner was in custody and the traffic stop became an investigative detention.

20.     Before Deputy Sanders next asked Mr. Turner if there were any weapons in the car–a question that Deputy Sanders must've known could well elicit an incriminating response–he should have advised Mr. Turner of his Miranda rights.  This Deputy Sanders failed to do, which resulted in Deputy Sanders unlawfully detaining and questioning Mr. Turner.

21.     After Deputy Sanders unlawfully detained and questioned Mr. Turner, any evidence derived from the questions Deputy Sanders asked Mr. Turner or from the search he conducted of Mr. Turner's car is impermissibly tainted in Fourth Amendment terms. Further, the statement that Mr. Turner provided to Investigator McCain when he was questioned at the Jail is also tainted as "fruit of the poisonous tree." The fact that Investigator McCain advised Mr. Turner of his rights does not cure the taint, because Investigator McCain failed to give Mr. Turner a cleansing statement that informed Mr. Turner that any earlier unwarned incriminating statements and any evidence seized could not be used against him.

22.     Therefore, under the circumstances of this case, all the items seized from Mr. Turner and all the statements that Mr. Turner made, as well as all evidence obtained from or as the fruit of such seizures, must be suppressed.

**WHEREFORE**, the Defendant respectfully prays that this Motion be granted.

Dated this 25th day of January 2006.

                Respectfully submitted,

                s/ Donnie W. Bethel
                DONNIE W. BETHEL
                Assistant Federal Defender
                201 Monroe Street, Suite 407
                Montgomery, Alabama 36104
                Phone: (334) 834-2099
                Fax: (334) 834-0353
                E-mail:don_bethel@fd.org
                IN Bar Code: 14773-49

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **CASE NO: 3:05-CR-287-F** |
| | ) | |
| **CORNELIUS DONAL TURNER** | ) | |

**CERTIFICATE OF SERVICE**

     I hereby certify that on January 253, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Kent Brunson, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

                                   Respectfully submitted,

                                   s/ Donnie W. Bethel
                                   DONNIE W. BETHEL
                                   Assistant Federal Defender
                                   201 Monroe Street, Suite 407
                                   Montgomery, Alabama 36104
                                   Phone: (334) 834-2099
                                   Fax: (334) 834-0353
                                   E-mail: don_bethel@fd.org
                                   IN Bar Code: 14773-49