### IN THE UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **CASE NO: 3:05-CR-287-MEF** |
| | ) | |
| **CORNELIUS DONAL TURNER** | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS

**COMES NOW** the defendant, **CORNELIUS DONAL TURNER**, by undersigned counsel and, pursuant to this Court's Order filed on March 17, 2006, submits this memorandum of law, which supplements his motion to suppress.

1. The predicate issue in this case is whether Mr. Turner was "in custody" at the time that Deputy Sanders questioned Mr. Turner as he sat on the hood of Deputy Sanders' patrol car during the traffic stop that occurred shortly after midnight on June 23, 2005. "Whether [Mr. Turner] was 'in custody' and entitled to *Miranda* warnings is a mixed question of law and fact." *United States v. Moya*, 74 F. 3d 1117, 1119 (11th Cir. 1996).

2. The Supreme Court has "long acknowledged that stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief." *Berkemer v. McCarty*, 468 U.S. 420, 436-437 (1984). The Court noted, however, that a motorist is not 'in custody' for the purposes of *Miranda* because two key factors mitigate the danger that a citizen so detained would be induced to make a statement where he might otherwise remain silent: "First, detention of a motorist pursuant to a traffic stop is

presumptively temporary and brief. . . . Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. . . . Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist." *Id*. at 337. Although "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*, . . . [i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id*. at 440. The Court has left it to lower courts to decide, based on the facts of each case, "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id*. at 337.

    3.    Two cases, *United States v. Perdue*, 8 F.3d 1455 (10th Cir. 1993), and *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004) illustrate that no two traffic stops are quite the same. In both cases defendants made two incriminating statements: the first statement was made prior to *Miranda* warnings, and the second statement was made after *Miranda* warnings. In both cases the courts analyzed the facts in light of the guidance provided in *Berkemer;* Mr. Perdue's conviction was overturned on appeal, while Mr. Acosta's conviction was upheld. In *Acosta* the Eleventh Circuit specifically considered and distinguished the Tenth Circuit's ruling in *Perdue*.

    4.    In the first case police officers executed a search warrant and discovered drugs

and guns in a building at a rural location in Kansas. While the officers were on the scene Mr. Perdue turned his car onto the long dirt road that led to the property and headed toward the building in question. As he approached the building and saw the police officers he attempted to reverse direction and leave the scene. Before he could do so, however, the officers, with weapons drawn, stopped Mr. Perdue's car. The officers ordered Mr. Perdue and his passenger, his pregnant girlfriend, out of the car and onto the ground, face down, all while police helicopters circled overhead. *Perdue* at 1458. When one of the officers asked Mr. Perdue what he was doing there, Mr. Perdue replied that he was there to check on his stuff. The officer then asked, "What stuff?" Mr Perdue answered, "The marijuana I know you guys found in the shed." The officer then advised Mr. Perdue of his *Miranda* rights. During the course of an ensuing interrogation with another officer, Mr. Perdue made further incriminating statements concerning the possession and distribution of marijuana. *Id.* at 1459. The Tenth Circuit acknowledged that the officers were reasonable, under the circumstances, in the amount of force they displayed during the initial stop of Mr. Perdue, but concluded "that any reasonable person in Mr. Perdue's position would have felt completely at the mercy of the police." *Id.* at 1465 (quoting *Berkemer* at 438). The court found that neither of the factors articulated in *Berkemer* were present in this case, specifically noting that the "stop occurred in an isolated, rural area not subject to the public's scrutiny." The court held that, under the circumstances, that Mr. Perdue was in custody while the officer asked Mr. Perdue questions prior to advising him of his *Miranda* rights. The court next held that because the officer asked the questions with the suspicion that Mr. Perdue was

involved with the marijuana that the questions were reasonably likely to elicit an incriminating response. Therefore, the initial unwarned statements were inadmissible. *Id*.

5. In the second case officers stopped Acosta's car because they suspected he possessed a substantial amount of money that was part of a money-laundering scheme. When an officer asked Acosta if he had any money, weapons or drugs in the car, Acosta said that he did not. After consenting to a search of his car, but before the search took place, Acosta then admitted that he did have money in the car. This statement was made without the benefit of *Miranda* rights advisement. When the search of Acosta's car uncovered the money and some heroin, an officer arrested Acosta and read him his *Miranda* rights. Acosta then confessed that the heroin also belonged to him. At trial Acosta moved to suppress all statements made, both before and after being arrested and read his *Miranda* rights, and all evidence seized. *Acosta* at 1143. The Eleventh Circuit contrasted the facts of this case with the facts in *Perdue*, specifically pointing out that, "Instead of being detained in a remote area far from public scrutiny, Acosta was stopped in the parking lot of an apartment building in broad daylight. The officers actions were visible to anyone who chose to look." *Id*. at 1150. The court further noted that Acosta was not placed in a police car and was assured that he wasn't under arrest. *Id*. The court held that, "The totality of the circumstances were such that a reasonable person in Acosta's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and better confess or else. No *Miranda* warnings were required at that time." *Id*.

6. Mr. Turner's case falls somewhere in the middle of the spectrum of traffic

stops that has *Acosta* on one end and *Perdue* on the other. Mr. Turner's traffic stop was on a rural road in the wee hours of the morning. He was indisputably far from the public eye and at the mercy of police. Deputy Sanders initially approached Mr. Turner's car with his gun drawn, and was confrontational about what Mr. Turner was reaching for in the seat next to him. While Deputy Sanders made multiple trips to Mr. Turner's car and back to his patrol car, the traffic stop dragged on for about 25 minutes, while Mr. Turner spent much of that time with his arms hanging out the window of his car so that Deputy Sanders could see Mr. Turner's hands. Deputy Sanders called for other officers to come to the scene to assist him. When those additional officers arrived Deputy Sanders ordered Mr. Turner out of his car and had him sit on the hood of the patrol car while Deputy Sanders questioned him. Mr. Turner testified that he certainly knew that he was not free to leave, that he had to answer Deputy Sanders' questions and that he would have remained silent if he had been advised of his *Miranda* rights. Deputy Sanders freely admitted during his testimony that he was suspicious that Mr. Turner may have possessed a gun or other contraband in his car. Deputy Sanders further acknowledged that if Mr. Turner were a convicted felon or had no permit to carry a gun then Mr. Turner's response to Deputy Sanders' questions would clearly be incriminating. Under the circumstances of this case, though he had not been formally arrested, police officers exerted upon Mr. Turner pressures that sufficiently impaired his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights before he was questioned. Therefore, the statements that Mr. Turner made to Deputy Sanders before he was advised of his *Miranda* rights should be suppressed, and the evidence seized

from Mr. Turner's car should also be suppressed as the fruit of the statements obtained during the illegal custodial interrogation.

7.  The next question is whether the statement that Mr. Turner made after he was advised of his *Miranda* rights should also be suppressed. To resolve this question Mr. Turner relies upon *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert* the Court specifically addressed the issue of the admissibility of a second statement made after rights advisement where an earlier unwarned statement was made during a custodial interrogation.

8.  In *Seibert* the police questioned the defendant about a murder. The initial questioning took place at the police station, without the benefit of a rights advisement. When Seibert incriminated herself in the murder, the officer questioning her left her alone in the interview room for 15 to 20 minutes. When the officer returned he gave Seibert *Miranda* warnings and had her execute a written waiver of her rights. During further questioning Seibert then incriminated herself again. The Court condemned the technique employed in *Seibert*:

> Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.[FN5]  A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for a knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

*Id*. at 613-614 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986). In holding that all of Seibert's statements, both pre- and post-*Miranda* warnings were tainted and inadmissible, the Court considered and distinguished *Oregon v. Elstad,* 470 U.S. 298 (1985).

9. In *Elstad* police officers went to a young suspect's home to take him into custody on a burglary charge. Before the arrest one officer spoke with the suspect's mother, while the other joined the suspect in a "brief stop in the living room." *Id*. at 315. Elstad admitted he had been at the scene of the crime after the officer said that he felt Elstad had been involved in the burglary. The Court found that the pause in the living room "was not to interrogate Elstad but to notify his mother of the reason for his arrest." *Id*. Elstad later fully confessed at the police station after being advised of and waiving his *Miranda* rights. The Court thought any causal connection between the limited statement at the home and the second complete statement at the police station was "speculative and attenuated." *Id*. at 313.

10. While Deputy Sanders in this case may not have been as calculating as the officers in *Seibert*, nonetheless he obtained an incriminating statement from Mr. Turner during a custodial interrogation. This statement led to the discovery of a gun and illegal drugs. Mr. Turner was held in custody continuously until he made a second statement some two hours later at the police station. Even though the investigator at the station advised Mr. Turner of his *Miranda* rights, Mr. Turner knew that he had already confessed to possessing the gun, and that his earlier confession led to the discovery of incriminating evidence. For these reasons, Mr. Turner's statements made at the police station after rights advisement, in addition to his earlier unwarned statement and the evidence obtained as the fruit of that

earlier statement, should be suppressed.

**WHEREFORE**, the Defendant respectfully prays that this Motion be granted.

Dated this 28th day of March, 2006.

Respectfully submitted,

s/ Donnie W. Bethel
DONNIE W. BETHEL
Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail:don_bethel@fd.org
IN Bar Code: 14773-49

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **CASE NO: 3:05-CR-287-MEF** |
| | ) | |
| **CORNELIUS DONAL TURNER** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Kent Brunson, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

Respectfully submitted,

s/ Donnie W. Bethel
DONNIE W. BETHEL
Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: don_bethel@fd.org
IN Bar Code: 14773-49