IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA      )
      )
v.      )     CASE NO.  3:05CR287-MEF
      )     [WO]
CORNELIUS DONAL TURNER.      )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the court is the defendant's ["Turner"] Motion to Suppress (Doc. # 15).  The parties have submitted legal memoranda and evidence in support of their positions, and the court has conducted an evidentiary hearing at which it received into evidence, ***inter alia***, a videotape of the traffic stop at issue.  Upon review of the relevant arguments, evidence, and law, the Magistrate Judge recommends that the motion be denied.

## I.    FACTUAL BACKGROUND

Late one evening, while driving west along a rural road in Lee County, Alabama, Turner encountered a Lee County Sheriff's patrol vehicle approaching from the opposite direction and, in apparent violation of section 32-5-242(c)(1) of the Alabama Code of 1975, failed to dim his headlights from their high intensity setting as the approaching vehicle passed him (Tr. 4-5; Gov't Ex. 1).  The driver of the patrol car, Lee County Sheriff's Deputy Jimmy Sanders ["Sanders"],  turned his car around, activated the emergency beacons, and

pursued Turner for approximately one quarter of a mile (Tr. 5-6, 10).[1]

During this brief pursuit, as his vehicle rapidly approached Turner's from behind, Sanders utilized the patrol car's spotlight to illuminate the interior of Turner's vehicle (Tr. 5). As Turner's car slowed, Sanders observed Turner reaching over and "moving around about the passenger's side" of the car. *Id.* Turner then steered his vehicle off the road on which Sanders had originally observed him and into a dimly lit residential area, where Turner, with Sanders's vehicle directly behind, slowly stopped his car along the side of the road in front of one of the neighborhood homes (Tr. 5-6, 14; Court's Ex. 1).

Sanders approached Turner's vehicle on foot, with his pistol drawn but held closely behind his right leg, apparently out of Turner's view (Tr. 21; Court's Ex. 1).[2] The deputy asked for Turner's driver's license, but Turner did not have a license or any other form of identification (Tr. 5-6; Court's Ex. 1; Court's Ex. 1).[3]

When subsequently asked for information about his identity, Turner, who was then wanted on outstanding warrants for traffic violations (Tr. 19), told Sanders that his name was Christopher Phillips and that his date of birth was 24 February 1984 (Tr. 6-10; Court's Ex.

---

[1] A videotape of the traffic stop indicates that, once Sanders's vehicle approached Turner's vehicle, Turner safely pulled to the side of the road and stopped within approximately 20 seconds, and the government does not contend that Turner was attempting to evade Sanders (Court's Ex. 1).

[2] Shortly after initiating verbal communication with Turner, Sanders returned his handgun to his holster. (Court's Ex. 1).

[3] "Every licensee shall have his license in his immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of . . . a peace officer or a state trooper." Ala. Code § 32-6-9 (1999 Repl.).

1).  He also provided Sanders with a Social Security Number and appeared to fumble when giving his address and explaining where he lived.  *Id.*[4]

After returning to his patrol vehicle, Sanders called for additional help, noting that Turner was "acting funny . . . not giving me his right address and all" (Court's Ex. 1).  He also relayed to the police dispatcher the information Turner had provided, but the dispatcher was unable to obtain any records establishing the existence of an individual matching Turner's apparent alias (Tr. 7-10; Court's Ex. 1).

Sanders then approached Turner's vehicle for a second time and asked him to repeat the information he had previously provided (Tr. 7-10; Court's Ex. 1).  Turner repeated the name, Christopher Phillips, offered a date of birth that differed from the birth date he originally gave by two years and said that he was not sure of the correct Social Security

---

[4]Turner's description of the facts, as evidenced by his two memoranda and statements made by his attorney at the evidentiary hearing, attempts to portray Sanders as being somewhat abusive. Specifically, through counsel, Turner accused Sanders of not informing him of the reason for the traffic stop and of forcing him to leave his arms hanging out of the window of the driver's side of his car for an extended period of time.  The videotape of the traffic stop refutes both contentions.

Shortly after Sanders initiated communication with Turner, Turner inquired into the reason for the stop.  Sanders immediately responded, "You didn't dim your headlights" (Court's Ex. 1). Turner then said, "Oh, my bad." *Id.*

In addition, although Sanders did ask Turner to keep his hands "over here" while talking to him and "up there" when he first returned to his patrol car, and Turner apparently understood this to mean hang them out of the window, Sanders never specifically instructed Turner to do so (Court's Ex. 1).  Approximately 12 minutes later, after returning to Turner's vehicle a third time, Sanders twice told Turner to relax and that he could place his hands on the steering wheel.  *Id.*  Turner acknowledged Sanders's statements but chose to keep his arms outside the vehicle.  *Id.*

3

Number. *Id.*[5]

Approximately 23 minutes after Turner pulled his car to the side of the road, after Sanders had made several attempts to ascertain Turner's true identity through the police dispatcher, a second police officer, dressed in civilian clothes, arrived on the scene (Tr. 11; Court's Ex. 1). As this officer, Investigator Eric McCain ["McCain"], approached the passenger side of Turner's vehicle, Turner exited the car on Sanders's instruction (Court's Ex. 1).

Sanders then gave Turner an exterior pat down, explaining that he was looking for weapons. *Id.* Sanders then instructed Turner to sit against the front of the patrol vehicle, parked several feet behind Turner's car, and asked him whether there was anything in the car that he should know about. *Id.* Turner responded, "There's a gun in there." *Id.*[6] Sanders

---

[5]Turner's responses provided additional reason to suspect that he was lying. For example, when asked to spell his name, he responded "C-h-r-i-s-t-o-*r*-p-h-e-r" (Court's Ex. 1) (emphasis added). In addition, he first told Sanders that his house number in Columbus, Georgia, was "19" and immediately changed it to "1900". *Id.* He also initially stated that his middle name was Denard but immediately changed it to Dewayne. *Id.*

[6]At the evidentiary hearing, Sanders testified that Turner had told him that "there was a *pistol* under the driver's seat" and that he "then asked if [Turner] had a permit for the *pistol*" (Tr. 13). As clearly indicated by the videotape, Turner specifically said that there was a "gun" in the car, not a *pistol*. Moreover – again by reference to the videotape – Sanders did not ask Turner if he had a permit for a *pistol*. Sanders's testimony that he and/or Turner used the word *pistol* is therefore not credible (Court's Ex. 1).

The distinction between a "gun" and a "pistol" is not material for the purpose of addressing Turner's argument in his motion, because his motion does not challenge the reasonableness of the limited vehicle search that Sanders conducted after Turner informed him that the vehicle contained a "gun." It nevertheless bears noting that in Alabama one need not obtain a permit to carry a "gun" in a vehicle. One must, however, obtain a permit to carry a pistol. Ala. Code 13A-11-73 (2005 Repl.).

4

then asked, "You got a permit?" *Id.* "No, sir," Turner responded. *Id.*

McCain then placed handcuffs on Turner, but told him that he was not at that time under arrest (Tr. 14; Court's Ex. 1). Once Turner was securely handcuffed and again leaning against Sanders's patrol car, and with McCain standing between Turner and the car, Sanders returned to Turner's vehicle to secure the gun, later identified as a "Lorcin Model L380, .380 caliber semi-automatic pistol, serial number 430567" (Doc. # 1, p. 1). While reaching under the driver's seat for the gun, Sanders noticed a plastic bag on the passenger side of the front seat that contained what appeared to be crack cocaine (Tr. 16).

Turner was arrested and later charged by the United States for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (2000), for possessing "with intent to distribute in excess of 5 grams of cocaine base (crack cocaine), a Schedule II Controlled Substance, in violation" of 21 U.S.C. § 841(a)(1), and possessing a firearm during the "furtherance of a drug trafficking offense"in violation of 18 U.S.C. § 924(c)(1)(A) (Doc. # 1).

## II.   ARGUMENTS AND ANALYSIS

Turner contends that the following were the products of an unreasonable seizure conducted in violation of the Fourth Amendment to the United States Constitution:

1.     the statements he made to Sanders and McCain on the scene of the

        traffic stop;

2.    statement's later made to McCain in a subsequent interrogation; and

3.    the tangible evidence obtained as the result of the searches conducted at the scene

(Docs. ## 15, 25).  U.S. CONST. amend. IV.[7]

Alternatively, Turner contends that Sanders violated his Fifth Amendment right to be free from compelled self-incrimination when Sanders interrogated him while in custody without informing him of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966) (Docs. ## 15, 25).  U.S. CONST. amend. V.[8]  Under either theory, Turner contends, the evidence should be excluded from trial.

Finally, Turner contends that statements he made to McCain during the course of a subsequent interrogation should be excluded because McCain failed to inform Turner that the evidence against him had been obtained unlawfully.[9]  *Id.*

---

[7]    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

[8]"No person shall be . . . compelled in any criminal case to be a witness against himself. . .." U.S. CONST. amend. V.

[9]The parties submitted no evidence of this interrogation.

6

**A.    Turner's Lawful Detention**

The court finds that Turner's contention regarding the alleged Fourth Amendment violation lacks merit. As Turner acknowledges, while a traffic stop is considered a seizure for Fourth Amendment purposes, "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809 (1996); *see also* ***United States v. Pruitt***, 174 F.3d 1215, 1217 n.1 (11th Cir. 1999). In this case, the government has presented evidence that Turner failed to dim his headlights as required by law, and Turner has failed to offer any evidence that would suggest otherwise. Therefore, the initial traffic stop was reasonable and did not, on its face, violate Turner's Fourth Amendment rights.[10]

In addition, the appellate courts, including the Supreme Court, have established that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." ***Pennsylvania v. Mimms***, 434 U.S. 106, 111 n.6 (1977). Thus, it was not improper for Sanders to instruct Turner to exit the vehicle, a conclusion further supported by Turner's actions while pulling his car to the side of the road and his apparent dishonesty in providing false information about his identity.

Finally, with respect to the duration of the stop, Turner fails to cite to legal authority

---

[10]The court again expresses its concerns about the potential abuse of authority inherent in the holding in ***Whren***. *See* ***United States v. Uriostegui***, Case No. 2:05CR291-MHT (Doc. # 22, March 20, 2006).

that suggests that a police officer may not detain the subject of a properly initiated traffic stop as long as is necessary to establish the subject's identity. *See United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) ("A traffic stop . . . can doubtlessly last long enough to conduct a variety of checks about licenses, registration, insurance and so on."); *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) ("[T]he duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop."). As the facts discussed *supra* make clear, Sanders had ample reason to suspect that Turner, who denied having any form of identification on his person, was not being honest about his identity, and Sanders could not reasonably have issued Turner even a simple citation without first positively identifying him. Thus, his continued inquiry into Turner's identity was reasonable under the circumstances. Moreover, a dishonest defendant may not use the Fourth Amendment to challenge the duration of a lawful detention when the defendant's inability to free himself from the detention is due to his being ensnared in his own web of lies.

Neither the initial traffic stop nor the duration thereof violated Turner's Fourth Amendment rights.

**B.     *Sanders's Questioning***

Turner contends that the questions Sanders posed to him while he was standing against the patrol car were improper because he was in custody as a matter of law, and he therefore should have been informed of his constitutional rights. The government contends

that Turner was not in custody, and the court agrees.

To guarantee the Fifth Amendment's protection against compelled self-incrimination, prior to interrogating an accused who is in the custody of police, the police must inform him that "he as a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent," which means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The difficult issue of whether a particular set of circumstances constitutes "custody" for purposes of a Fifth Amendment analysis has been the subject of much judicial opinion writing, and, utilizing Turner's phrase, it is the "predicate issue in this case" (Doc. # 25, p. 1). A finding that Turner was not in custody when he was first questioned by Sanders renders his remaining arguments moot.[11]

Relying on the Supreme Court's opinion in *Berkemer v. McCarty*,[12] which explained why a traffic stop generally is not considered custody for Fifth Amendment purposes, and

---

[11] The court assumes without deciding that Sanders's questioning constituted an interrogation for Firth Amendment purposes.

[12] 468 U.S. 420 (1984).

9

describing the federal appeals courts' opinions in **United States v. Perdue**[13] and **United States v. Acosta**[14] as having established "a spectrum of traffic stops" guiding the courts in determining whether someone stopped for a traffic violation is in custody, Turner contends that the following facts compel a finding that he was in custody:

> Mr. Turner's traffic stop was on a rural road in the wee hours of the morning. He was indisputably far from the public eye and at the mercy of police. Deputy Sanders initially approached Mr. Turner's car with his gun drawn, and was confrontational about what Mr. Turner was reaching for in the seat next to him. While Deputy Sanders made multiple trips to Mr. Turner's car and back to his patrol car, the traffic stop dragged on for about 25 minutes, while Mr. Turner spent much of that time with his arms hanging out the window of his car so that Deputy Sanders could see Mr. Turner's hands. Deputy Sanders called for other officers to come to the scene to assist him. When those additional officers arrived Deputy Sanders questioned him. Mr. Turner testified that he certainly knew that he was not free to leave, that he had to answer Deputy Sanders' questions and that he would have remained silent if he had been advised of his *Miranda* rights.

(Doc. # 25, p. 5).

In **Berkemer**, the Supreme Court articulated the question to be addressed by the courts when deciding whether a traffic stop constitutes custody for Fifth Amendment purposes as "whether [the] traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." 468 U.S. at 437. The inquiry is largely objective, and the court must

---

[13] 8 F.3d 1455 (10th Cir. 1993).

[14] 363 F.3d 1141 (11th Cir. 2004).

determine "how a reasonable [person] in the suspect's position would have understood his situation." *Id.* at 442.

The Court then described several factors common among the circumstances of most traffic stops that "mitigate the danger that a person questioned will be induced to 'speak where he would not otherwise do so freely'": (1) the relatively brief duration; (2) the public nature of most stops; and (3) "[t]he fact that the detained motorist typically is confronted by only one or at most two policemen." *Id.* at 437-39. "In short, the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in ***Miranda*** itself . . . and in the subsequent cases in which we have applied ***Miranda***." *Id.* at 439.[15]

Turner relies on ***Perdue*** to exemplify the circumstances in which a traffic stop

---

[15]Relying on the principle established in ***Terry v. Ohio***, 392 U.S. 1 (1968), the Court stated that, while the scope of permissible questioning during the course of a traffic stop to investigate further possible illegal activity is limited, the police officer nevertheless "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." ***Berkemer***, 468 U.S. at 439.

Addressing the particular circumstances of the case, the ***Berkemer*** court held that the defendant in the case was not in custody.

> Only a short period of time elapsed between the stop and the arrest. At no point during that interval was respondent informed that his detention would not be temporary. . . . [A] single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.

*Id.* at 442.

unquestionably amounts to police custody. The Tenth Circuit Court of Appeals described

the circumstances at issue in *Perdue* as follows:

> Mr. Perdue was forced out of his car and onto the ground at
> gunpoint. He was then questioned by two police officers while
> police helicopters hovered above. During the questioning, Mr.
> Perdue remained face down on the ground while the officers
> kept their guns drawn on and his pregnant fiancee.

8 F.3d at 1464.

Consequently, the Tenth Circuit held, "A reasonable man in Mr. Perdue's position

could not have misunderstood the fact that if he did not immediately cooperate, his life would

be in danger. Any reasonable person would have felt 'completely at the mercy of the

police.'" *Id.* at 1465 (quoting *Berkemer*, 468 U.S. at 438). The Tenth Circuit further

distinguished the case before it from that before the Supreme Court in *Berkemer*, stating:

> The *Terry* stop [in this case] occurred in an isolated, rural area
> not subject to the public's scrutiny. The stop was not for a
> routine traffic matter such as a speeding ticket. The officers
> forced the car to stop with their guns and then questioned the
> suspect with weapons drawn. We believe this case presents the
> precise scenario envisioned by the *Berkemer* Court when it
> indicated that *Miranda* warnings might be implicated in certain
> highly intrusive, "non-arrest" encounters.

*Id.* at 1466.

Similar to the circumstances in *Perdue,* the detention that occurred in *Acosta* resulted

from reasonable suspicions that the suspect was preparing to engage in a major sale of

controlled substances. 363 F.3d at 1143, 1145. After discussing both *Berkemer* and *Perdue*,

however, the Eleventh Circuit Court of Appeals distinguished *Perdue* from the case before

12

it:

> Instead of being detained in a remote area far from public scrutiny, Acosta was stopped in the parking lot of an apartment building in broad daylight. The officers' actions were visible to anyone in the area who chose to look. Instead of being questioned at gunpoint, Acosta was questioned after any weapons were quickly put back into their holsters. Instead of being forced to lie face down, Acosta remained standing the entire time. No physical force was used against him. He was not handcuffed. He was not even placed in a police car at the time. He was assured that he was not under arrest. And, of course, there was no pregnant fiancee with guns pointed at her, and no police helicopters circling overhead.

*Id.* at 1150.

Acosta had been detained and questioned by "five or six officers", and "[a]t least one officer had his gun drawn, but all of the officer's guns were re-holstered within ten-seconds."

*Id.* at 1143. The Eleventh Circuit summarized its relevant conclusion as follows:

> The restraint to which Acosta was subjected during the *Terry* stop is the minimal amount necessary for such a stop or close to it. The stop did not involve the type of "highly intrusive" coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in Acosta's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No *Miranda* warnings were required at the time.

*Id.* at 1150.

Before specifically addressing Turner's contention that this case is more like *Perdue* than *Acosta*, the court notes that Turner's view of the circumstances leading to his arrest is somewhat strained. Contrary to Turner's view, while the stop did occur at night in a

13

generally rural part of Alabama, he was nevertheless stopped in a residential neighborhood directly in the midst of several homes on a street at least partially lined with streetlights and not far from local businesses.[16]  During the entire encounter, Sanders kept his vehicle's blue and white, flashing emergency beacon activated, and Turner's vehicle and the area immediately surrounding it were well lit by Sanders's vehicle's lights (Court's Ex. 1).

In addition, the evidence before the court establishes that when Sanders initially questioned Turner about his identity, he was the only officer on the scene.  When Sanders later asked him about the contents of the vehicle, only one other officer, Investigator McCain was on the scene.  McCain, who was casually dressed in khaki pants, an untucked shirt and a baseball cap, did not speak until Turner admitted having a gun in the car.  Finally, Turner's reference to the fact that he "testified" is puzzling considering he did not testify at the evidentiary hearing, and the court is unaware of his having testified anywhere else.

Viewed in the proper context, the only meaningful fact in Turner's favor that distinguishes this traffic stop from the detention in *Acosta* or even *Berkemer* is that the stop in the instant case took place at night.  Considering all of the factors the Eleventh Circuit noted as material, however, the setting of the sun does not alone transform Turner's continued detention from an otherwise typical *Terry* stop into circumstances in which a reasonable person would have believed himself to be "utterly at the mercy of the police, away

---

[16]In the videotape of the stop, when explaining his location to someone by radio or telephone, Sanders described his location as "route 490, right behind that store that got broke into" (Court's Ex. 1).

14

from the protection of any public scrutiny" or one who "had better confess or else." **Acosta**, 363 F.3d at 1150. This conclusion is buttressed by the fact that Sanders was non-confrontational[17] and attempted to put Turner at ease.

Although Turner had every reason to suspect that Sanders was skeptical of the false information that he provided and that he would eventually discover that Turner was wanted on other warrants, Turner's guilty conscience or fear of getting caught in a lie cannot be considered relevant when determining whether the actions of *law enforcement* would lead a reasonable person to believe that he had no choice but to cooperate and provide the information sought. It is the suspect's reaction *triggered* by an officer's statements and conduct and the circumstances of the stop, not the suspects self-generated fears, that determines whether the suspect is in custody.

Therefore, Turner was not in custody for **Miranda** purposes when Sanders asked him whether there was anything in the car that he should know about.


C.    *Remaining Issues*

In his motion to suppress, Turner described the issues before the court as

> 1.    Whether Mr. Turners [sic] was unlawfully detained and questioned when Sheriff's Deputy Jimmy Sanders initiated a traffic stop on June 23, 2005? [sic]

> 2.    If Mr. Turners [sic] was unlawfully detained and

---

[17]Although Sanders drew his weapon upon exiting his car, there is no evidence that Turner saw it or was threatened by it.

> questioned, whether all evidence obtained as the result of
> that unlawful detention and questioning should be
> suppressed? [sic]

(Doc. # 15, p. 1). Because the court answers the first question in the negative, it is

unnecessary to address the second question.

Furthermore, because Turner does not challenge the reasonableness of the search, the

court declines to scrutinize Sanders's actions further. To do so, the court believes, would

usurp the role of the attorneys in this case and cross the often fine, albeit important, line

separating judicial scrutiny from judicial interference.

## III.    CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that Turner's

motion to suppress be DENIED.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said

Recommendation on or before 12 May 2006.  Any objections filed must specifically identify

the findings in the Magistrate Judge's Recommendation.  Frivolous, conclusive or general

objections will not be considered by the District Court.  The parties are advised that this

Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a *de novo* determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual

findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982). *See **Stein v. Reynolds Securities, Inc.**, 667 F.2d 33 (11th Cir. 1982). *See also **Bonner v. City of Prichard***, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 28th day of April, 2006.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE